*1:26-cv-221 AW MAF*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF FLORIDA**

**(Tallahassee Division)**

**SAMINA LEE** CRANEY , Plaintiff,

v. **Case No.:**

**GENERAL DYNAMICS ORDNANCE AND TACTICAL SYSTEMS, INC.,**

Defendant.

**THE ANATOMY OF A PREMEDITATED TERMINATION: A CHRONICLE OF DISCRIMINATION AND DECEIT**

Plaintiff, **Samina Lee Fuller**, appearing *pro se*, sues Defendant, **General Dynamics Ordnance and Tactical Systems, Inc.**, and alleges as follows:

**I. JURISDICTION AND VENUE**

1. This action is brought pursuant to **Title VII of the Civil Rights Act of 1964** and the **Americans with Disabilities Act (ADA)** to correct unlawful employment practices on the basis of race, gender, and disability.

FILED USDC FLND TL
MAY 8 '26 PM4:14

2. The unlawful employment practices occurred in Tallahassee, Florida, within this judicial district.

## II. PARTIES

3. Plaintiff, **Samina Lee Fuller**, is an African American female and was at all times relevant an employee of Defendant.

4. Defendant, **General Dynamics Ordnance and Tactical Systems, Inc.**, is a government contractor operating in Tallahassee, Florida.

## III. STATEMENT OF FACTS

### a. THE BREAK AREA AMBUSH:

5. On or about 9/13/2024, Plaintiff committed the "infraction" of a scheduled break in a designated area with her husband, Mark Craney, also a GD employee who was on shift.

6. While two white male employees—**Kevin Grogan** (who drove the vehicle to the Plaintiff's work area) and her husband—were equally present, the "investigation" and discipline that followed was surgically focused on Plaintiff alone, although she was the only one in her designated area.

7. Following this, on 9/17/2024 Plaintiff was informed she was being placed on a one-week paid suspension by **Ryan Wolverton.**

8. On September 19, **Ryan Wolverton** initiated the psychological phase of this attack, claiming vague "information" had surfaced that required the plaintiff to surrender her medical privacy to an on-site nurse.

9. On September 23, the mask fell. The site nurse revealed that General Dynamics had been digging into Plaintiff's private medical history—specifically a back injury and anxiety.

10.  The plaintiff was given an ultimatum: submit to a "Fitness for Duty" evaluation or face termination.

### b. MEDICAL STALKING AND VIOLATION OF THE PERSON:

11. The evaluations were to be conducted via mandatory EAP therapy sessions.

12. Plaintiff was also required to undergo a medical evaluation for her prior back injury at Jet Medical.

13. Plaintiff was told she had 24 hours to contact EAP to be deemed in compliance by the nurse.

14. Plaintiff immediately contacted EAP and, during the intake phone call, was asked if they could contact her other healthcare providers to which she explicitly declined.

15. On 2/23/25 and 3/26/2025 Plaintiff made formal attempts via email to request any information that EAP had collected and shared with General Dynamics.

16. The aforementioned record requests were ignored.

17. Plaintiff also attempted to contact HR at General Dynamics and request her personnel file, on 2/23/25 via email.

18. Plaintiff also demanded her personnel file at an earlier date during a phone call with Ryan Woolverton.

19. Ryan told the plaintiff on the phone they would need to consult their legal team.

20. These requests were eventually ignored.

### c. DISABILITY DISCRIMINATION AND BLATANT RACISM

21. According to email and phone records plaintiff had a therapy session on 9/24/24 and another on 10/2/2024.

22. Plaintiff received communications from Dr. Gerald Myers who provided educational materials to support her.

23. Dr. Myers took note that he felt the accusation of aggression may have been racial bias, which is  documented in an email.

24. After receiving this interpretation from Dr. Myers, EAP asked for additional proof of ongoing therapy sessions.

25. Plaintiff questioned this via email since she had already completed the two mandated appointments.

26. This was an instance of the rules being differentially applied to Plaintiff because she was expected to do more than the standard protocol and they refused to explain why when questioned via email.

### d. THE GROTESQUE DOUBLE STANDARD:

27.  Plaintiff was forced to undergo medical evaluations for her prior back injury despite never having complained requested accommodations.

28. Defendant further claimed "heavy lifting" was a requirement for Plaintiff's role to justify medical scrutiny, yet subsequently re-posted the job listing without a heavy lifting requirement.

29. Plaintiff also underwent and passed a fit for duty examination with the on site nurse during her initial onboarding.

30. Plaintiff first visited Jet Medical, who took her off work.

31. Plaintiff then was required to visit her orthopedic surgeon who stated that she was fit for duty with no physical limitations.

32. This injury had only been shared in confidence with supervisor **Eric Ramos**, who shared his own medical history regarding his ongoing knee problems.

33. Eric Ramos shared with the Plaintiff that he had dislocated his knees three times.

34. Eric Ramos also stated to the plaintiff that during his time at GD other employees had had to step in and help him with any lifting due to his ongoing physical disability related to his knee injuries.

35. During the course of the investigation, Eric actually took time off work to undergo surgery, but was never subjected to or threatened with fitness-for-duty testing.

### e. FINANCIAL STARVATION - SEDGWICK SABOTAGE

36. On 9/24/24, as directed by Ryan Woolverton, Plaintiff contacted Sedgwick, General Dynamics short term disability service center.

37. By then Plaintiff was no longer on paid suspension chich had only lasted a few days.

38. Plaintiff was instructed by Ryan to try and get short term disability payment from Sedgwick after being forced to exhaust her hard earned PTO.

39. This was eventually denied, and Ryan Woolverton informed the plaintiff that this was because she was considered to be on personal leave not disability, despite being taken off work from Jet Medical and having no choice in being placed on suspension.

### f.  HOSTILE WORK ENVIRONMENT AND PRETEXTUAL TERMINATION

40.  Plaintiff was subjected to "petty policing". Plaintiff was told on and blamed for graphite residue although it was everywhere, on everyone's locker, and coating the walls, floor, and work stations, as well as caked in thick layers that spanned a diameter of multiple feet around the AC vents due to the nature of the work.

41. Plaintiff in fact was the only one who took the time daily to move equipment and clean up dangerous gunpowder buildup that was neglected by others.

42. Plaintiff was told on and constantly policed for communication style despite being professional and focused on work.

43. Although the dress code is casual, Plaintiff was told on for her clothing and experienced a level of scrutiny for dress code compliance (leggings) that was not applied to other employees who wore tight jeans.

44. Plaintiff was socially ostracized by coworkers, specifically employees named **Ebony and Sean**, who would walk away when Plaintiff spoke.

45. It became a trend to not respond to the plaintiff in group settings if I spoke up.

46. In turn, I was also told on and subjected to a "talking to" by Eric Ramos for speaking less frequently in response to hostile behavior.

### g. THE NONEXISTENT "STANDARD OF PROFESSIONALISM" FOR WHITE MALE COUNTERPARTS:

47. The actions taken toward the plaintiff differed from the company's treatment of other employees with the same job title as her.

### g(i) The aggressor:

48. Plaintiff herself made a report about Warren Wollschlager, a white male, who demanded to switch roles with her for the day, threatened to leave her to do all the work on her own, while demonstrating an aggressive and agitated demeanor.

49. This included Warren tossing a lab instrument in the direction of the plaintiff.

50. The plaintiff discussed the incident with Warren with Eric Ramos (Lab manager) and Ronnie Isaacs (Supervisor) via text.

51. He was not subjected to two mandated therapy sessions.

52. He was not also asked to prove participation in further sessions beyond what was mandatory.

**g(ii) The violent outbursts:**

53. Terry Debrow, a white male, has been in multiple yelling matches with superiors.

54. One in particular occurred with a lead named Bert where multiple employees overheard him yelling at Bert to "get the f*ck out of Terry's face".

55. Terry later recounted these words to the plaintiff as well.

56. There were multiple witnesses to this incident, particularly Richard Walker who declared that it was a hostile work environment and stepped in to mediate the fight.

57. This incident stood out to the plaintiff because she never got in any yelling matches or anything congruent with any of her coworkers or

superiors, but she was labelled as aggressive without reason and forced to do mandatory therapy sessions.

58. Terry was not asked to complete two mandated therapy sessions while on suspension for this incident.

59. Terry was not subsequently asked to show proof of additional sessions beyond the two mandated sessions.

60. Another incident involved Terry and Debra, a supervisor in another area of the plant.

61. Terry recounted to the plaintiff how he also got in a yelling match with Ms. Debra, and later came and interviewed with Jean Brooks, who, being informed of this behavior, actually decided to hire Terry in the chemistry lab, which differs starkly from Jean's treatment of the plaintiff.

62. Again, Terry was not asked to complete two mandated therapy sessions while on suspension for this incident.

63. Terry was not subsequently asked to show proof of additional sessions beyond the two mandated sessions.

### g(iii) The protected supervisors:

64. **Eric Ramos:** openly admitted to three knee dislocations and required subordinates to do his heavy lifting.

65. He took leave for surgery and returned without a single "Fitness for Duty" exam.

66. **Ronnie Isaacs:** has also been vocal about his mental health issues, namely in his words "Severe ADHD".

67. Ronnie was not asked to complete two mandated therapy sessions.

68. Ronnie was not asked to show proof of further sessions beyond the two mandated sessions, which differs from how the plaintiff was treated.

### h. BATFE KILL SWITCH AND FINAL FRAUD:

69. At some point between then and 10/1/2024, the mentally exhausted plaintiff received a phone call from Ryan Woolverton who stated in yet another act of pure malice and trickery that she was medically cleared for duty and could return to work.

70. Relieved, the plaintiff actually believed the past few weeks of running around to appointments and jumping through burning hoops had actually been worth it.

71. Plaintiff received another phone call shortly after telling her to come in person because they had received a notice from the ATF dated 11/12/2024 and wanted to discuss "next steps".

72. Ryan Woolverton - or rather, Ryan "Wolf in Sheep's Clothing"- assured the plaintiff that this was routine, and that he had seen this happen to other employees and it was often rectified.

73. On 10/1/24 Plaintiff drove 30 minutes for a final meeting with Patrick Hutto and Ryan Woolverton.

74. Plaintiff was told that actually, they had received notice from the BATFE telling them that it was illegal for her to possess explosives.

75. Plaintiff was informed during that meeting that she could resign to avoid having a termination on her record, or be terminated.

76. Plaintiff told them she didn't want to disqualify herself for unemployment and she would not resign.

77. The plaintiff did not receive a termination letter.

78. In fact, the notice did not even bear her name, instead bore someone else's first and middle name.

79. Patrick Hutto let something slip during this conversation.

80. Patrick Hutto mentioned that the ATF will sometimes reject licensure based on prior mental health hospitalization.

81. In fact, the plaintiff almost believed this was a valid cause for the rejection, although it did not make sense that the BATFE would issue a license then later revoke it.

82. In hindsight, due to the specificity of this comment the plaintiff feels a strong conviction that Patrick Hutto and Ryan "Wolf in sheep's clothing" Woolverton dug into the Plaintiff's past and discovered prior baker acts and possibly her stint with mental health court.

83. Plaintiff was never given the opportunity to provide consent for further background investigations.

84. The plaintiff believes the Patrick and Ryan expected her to believe her mental health history was the cause of the denial by the BATFE.

85. The plaintiff believes this comment shed light on an attempt to extort resignation through fear tactics and corporate spying.

86. Plaintiff began to initiate an appeal with the BATFE right away and informed Patrick and Ryan of this.

87. Plaintiff didn't find out until a continued voluntary session with Gerald Myers that her status had been changed to terminated.

88. Plaintiff left messages at this time stating that she felt that everything she had been subjected to amounted to systematic discrimination.

89. The plaintiff informed them via voicemail that she would be filing a complaint with the EEOC.

90. Defendant failed to engage in the **interactive process** to reassign Plaintiff to available roles not requiring said license (e.g., Water Treatment, HR, safety, supply chain, analyst, continuous improvement, or Janitorial/Maintenance).

### i. POST TERMINATION MALICE:

91. The plaintiff contacted the ATF right away in October.

92. After submitting to fingerprinting, the ATF attempted to rectify the error and reinstated the Plaintiff's license on or around November 1, 2024.

93. Both the ATF and the plaintiff contacted Olivia Anderson with General Dynamics HR to see if anything would change and received no reply.

94. The plaintiff also reapplied to the reposted job description after informing them that her license was now in good standing, but they declined to contact her or respond to calls.

95. The plaintiff is convinced they refused to rectify their actions as a form of retaliation, since they had been informed by plaintiff of her intent to file with the EEOC.

96. Following termination, Defendant provided fabricated justifications to the EEOC.

97. This included false claims of the plaintiff being caught "making out" with her husband, which was untrue.

98. This also included false claims of the plaintiff "screaming" at coworkers.

99. General dynamics also falsely claimed that the plaintiff was never an employee of General Dynamics but instead worked for St. Marks Powder.

100. This was disproven via payroll classifications and offer letter and orientation materials.

## VII. EXHAUSTION OF ADMINISTRATIVE REMEDIES

101. Following her termination, Plaintiff filed a formal charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on or around 09/28/24

102. On 2/27/2026, Plaintiff received a Notice of Right to Sue letter from the EEOC, thereby exhausting all required administrative remedies prior to filing this civil action.

## VIII. MITIGATION OF DAMAGES AND FINANCIAL IMPACT

103. Despite diligent efforts to secure comparable employment, the stigma of the retaliatory termination and the Defendant's bad-faith reporting caused Plaintiff to remain unemployed until February 2026.

104. Plaintiff was eventually forced to accept a position paying only $13.00 per hour, a devastating reduction from her $23.00 per hour wage (plus consistent overtime) at General Dynamics.

105. This drastic loss of income, coupled with the forced liquidation of her 401(k), has resulted in severe and ongoing financial instability.

## IX. COMPENSATORY DAMAGES: PSYCHOLOGICAL AND EMOTIONAL TOLL

106. The Defendant's actions—specifically the coordinated campaign of medical stalking, the fabrication of "aggression" charges, and the abrupt termination based on a document that did not even bear her name—caused Plaintiff to suffer profound clinical depression and emotional trauma.

107.The psychological impact of this targeted workplace betrayal has resulted in a deep-seated and ongoing distrust of professional environments.

108. To this day, Plaintiff suffers from residual trauma that manifests as a debilitating difficulty in being open or collaborative with coworkers, as the Defendant's "policing" of her communication and social ostracization has fundamentally altered her ability to feel safe in a workplace setting.

## X. LIQUIDATION OF RETIREMENT ASSETS AND PERMANENT FINANCIAL HARM

109. As a direct and proximate result of Defendant's retaliatory termination and the subsequent months of unemployment, Plaintiff was forced into a state of financial desperation.

110. To prevent total insolvency and cover basic living expenses, Plaintiff was compelled to **liquidate her entire 401(k) retirement account**.

111. This forced withdrawal resulted in substantial financial penalties, including a 10% early-withdrawal penalty and a significant tax liability, which were deducted directly from Plaintiff's retirement security.

112. Beyond the immediate penalties, Defendant's actions have caused Plaintiff permanent financial harm by stripping her of years of compounded market growth and the 6% employer-match contributions she had accrued during her tenure.

113. The loss of this retirement fund—Plaintiff's "safety net"—has contributed significantly to the ongoing emotional distress and sense of instability described in Paragraph 25.

## IV. CLAIMS FOR RELIEF

### COUNT I: Disability Discrimination (ADA)

114. Defendant discriminated against Plaintiff by subjecting her to unwarranted medical exams based on a perceived disability/injury.

## COUNT II: Race and Gender Discrimination (Title VII)

115. Plaintiff was subjected to disparate treatment and disciplined more harshly than similarly situated white male coworkers.

## COUNT III: Hostile Work Environment

116. Defendant permitted a pervasive environment of bullying and disparate policing that altered the terms of Plaintiff's employment.

## COUNT IV: Failure to Accommodate

117. Defendant failed to offer reassignment to non-licensed departments as a reasonable accommodation for the ATF administrative error.

## COUNT V: VIOLATION OF THE FAIR CREDIT REPORTING ACT (FCRA)

118. . Plaintiff alleges that Defendant conducted an **unauthorized background investigation** into her legal and criminal history without obtaining the mandatory, standalone written disclosure and authorization required by **15 U.S.C. § 1681b(b)(2)**.

119. Defendant utilized the information obtained from this unauthorized report to intimidate Plaintiff, specifically referencing her past mental health court history to suggest she was legally "unfit" for her role.

120. Defendant further violated the FCRA by taking adverse action ( forced leave) based on this information without providing Plaintiff with a copy of the report or a summary of her rights, as required by **15 U.S.C. § 1681b(b)(3)**.

## COUNT VI: INVASION OF PRIVACY (INTRUSION UPON SECLUSION)

121. Defendant intentionally and offensively intruded upon Plaintiff's solitude and private affairs by conducting a "fishing expedition" into her confidential mental health records, including Baker Act proceedings protected under **Florida Statute § 394.4615**.

122. This intrusion was unauthorized, highly offensive to a reasonable person, and conducted with the malicious intent to find "dirt" to justify a discriminatory termination.

123. Management's verbal allusions to Plaintiff's "mental health issues" prove that this private information was accessed and disseminated

internally among staff who had no legitimate business need for the information.

## COUNT VII: BREACH OF CONFIDENTIALITY AND SPOLIATION OF EVIDENCE

124. Plaintiff made multiple, documented demands to the EAP provider and Defendant's HR department (including Ryan Wolverton) for access to her records.

125. These demands were ignored or flatly refused in a coordinated effort to **withhold evidence** that would prove Plaintiff was "fit for duty" and that the accusations of aggression were biased.

126. Plaintiff alleges that Defendant's continued withholding of these files constitutes **Bad Faith** and a breach of the fiduciary duty an employer owes an employee to maintain accurate and accessible personnel records.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Award back pay and front pay;

2. Award compensatory and punitive damages for emotional distress and loss of reputation;

3. Grant any further relief the Court deems just and proper.

Respectfully submitted,

*Samina Lee Craney*

**Samina Lee Craney**

322 E Pershing St, Tallahassee, FL, 32301

8503544173

minafuller70@gmail.com